980 F.2d 1538
 61 USLW 2327
 AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE;
Benjamin Baum; Phyllis Ball; Walter Bergman;
John Charles Bearden; Gilbert R. Davis;
and James T. Weaver,
Plaintiffs-Appellees,
v.
CITY OF GRAND RAPIDS, Defendant-Appellant (91-1448),
Chabad House of Western Michigan, Inc., Intervenor-Appellant
(90-2337/91-1391).
 Nos. 90-2337, 91-1391 and 91-1448.
 United States Court of Appeals,
Sixth Circuit.
 Reargued Aug. 12, 1992.
Decided Nov. 16, 1992.
 
 Albert Dilley, Grand Rapids, Mich. (argued and briefed), for plaintiffs-appellees.
 G. Douglas Walton, Deputy City Atty., Grand Rapids, Mich. (argued and briefed), for defendant-appellant.
 Richard G. Leonard, Douglas P. Vanden Berge, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, Mich., David G. Webbert, Bradford M. Berry, Nathan Lewin (argued and briefed), David I. Gelfand, Niki Kuckes, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for intervenor-appellant.
 Before: MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, MILBURN, GUY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, Circuit Judges; and LIVELY, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 In this case, we sit en banc to determine whether a privately-funded menorah display, erected during Chanukah in a traditional public forum in Grand Rapids, Michigan, violates the Establishment Clause of the first amendment, as applied to state and local governments by the fourteenth amendment. We hold that it does not.
 
 
 2
 * Each year since 1984, Grand Rapids has granted Chabad House of Western Michigan, Inc. a permit to display a 20-foot high steel menorah in Calder Plaza during the eight days of the Jewish holiday of Chanukah. The menorah was purchased entirely with private funds and is owned by Chabad House, a private organization. Grand Rapids has no role in the planning, erection, removal, maintenance, or storage of the menorah. All display costs have been paid with private funds, except for the small cost of providing electricity for the display; however, even this cost is probably offset by a $2.50 permit fee charged by Grand Rapids.
 
 
 3
 Calder Plaza is located in the center of downtown Grand Rapids, and is the principal public plaza in the area, being four and one-half acres in size. The Plaza features a large sculpture by Alexander Calder, a drawing of which appears on the city's signs, vehicles, and stationery. The Kent County Building and Grand Rapids City Hall are also located on the Plaza, as are three flagpoles flying the flags of the United States, Kent County, and the City of Grand Rapids. Monroe Avenue runs along the west side of the Plaza. The Hall of Justice, which houses the district and circuit courts for Kent County and Grand Rapids, and the police station stand across Monroe Avenue from the Plaza. The Federal Building is on the Plaza's north side. Ottawa Avenue runs along the Plaza's east side, and across Ottawa Avenue stand the State of Michigan Office Building, the Probate Court Building, the Frey Building, and the National Bank of Detroit Building. The Old Kent Building and the Calder Plaza Building border the Plaza to the south and southwest. The Frey, National Bank of Detroit, Old Kent, and Calder Plaza Buildings are all private office buildings.
 
 
 4
 The menorah stands at the east side of the Plaza, 162 feet from the nearest governmental building, the Kent County Administration Building, and 256 feet from Grand Rapids City Hall. The menorah is adjacent to the three flagpoles, and 150 feet from the Calder sculpture. Grand Rapids requires that the menorah be accompanied by two signs, measuring two feet by three feet, which are illuminated at night. The signs read as follows:
 
 Happy Chanukah to All
 
 5
 This Menorah display has been erected by Chabad House, a private organization. Its presence does not constitute an endorsement by the City of Grand Rapids of the organization or the display.
 
 
 6
 From 1984 to 1988, one such sign was displayed. Since 1989, Grand Rapids has required Chabad House to display two illuminated signs. The signs are visible from the front and the back of the menorah. Chabad House conducts a candlelighting ceremony at the menorah for up to one hour on each of the eight nights of Chanukah. Other than these ceremonies, no Chabad House representative regularly attends the menorah. In previous years, there have been no displays of Christmas decorations on the Plaza contemporaneously with the menorah. Such displays have not been discouraged; Grand Rapids has simply chosen not to erect a Christmas display in the Plaza, and has received no applications for permits to display Christmas decorations.
 
 
 7
 Grand Rapids has made the Plaza available to the public for all forms of speech and assemblage; all parties agree that the city has treated the Plaza as a traditional public forum. Since 1969, a City Commission policy has provided guidelines for the Plaza's use. The guidelines provide:
 
 
 8
 [T]he City of Grand Rapids may, on behalf of itself and the County of Kent, authorize any person, organization, association, club, society or other group of any type to use and occupy any portion of the so-called Plaza area of the City-County Complex for the purpose of making or presenting any program, public address, exhibit or display, or for any other organized or semi-organized purpose whatever.
 
 
 9
 Between 1986 and 1990, Grand Rapids allowed numerous groups to use Calder Plaza for expressive activities of many types. For example, permits have been granted for a Right to Life rally, a Hunger Walk by the Grand Rapids Center for Ecumenism, and an Italian Festival (including a Catholic Mass on Sunday). Several of the previous events have involved the use of temporary structures comparable in size to the menorah. An Arts Festival involved a three-day erection of booths and exhibit areas, the Italian Festival involved a two-day erection of similar structures, and a Tennis Exhibition involved laying down a large canvas with court markings for two days. Furthermore, at oral argument, counsel for Grand Rapids stated that several shanties were recently erected in Calder Plaza to symbolize the plight of the homeless, and that these shanties stood for "quite some time."
 
 
 10
 In 1990, Chabad House once again applied for a permit to display its menorah in the Plaza from December 11 to 20, 1990, and Grand Rapids was prepared to grant that request. However, Americans United for Separation of Church and State, along with Benjamin Baum, Phyllis Ball, Walter Bergman, John Charles Bearden, Gilbert R. Davis, and James T. Weaver, brought suit in federal district court to enjoin Grand Rapids from allowing the proposed display.[1] On November 13, 1990, the plaintiffs moved for a preliminary injunction. The district court heard argument on the motion on December 5. Because Chanukah was imminent, the district court issued an oral opinion from the bench that granted the preliminary injunction. On December 21, the district court issued a full written opinion explaining its decision.
 
 
 11
 When Chabad House learned that Grand Rapids might not appeal this decision, it sought to intervene. On December 7, the district court scheduled a hearing on the motion to intervene for December 18. Because this schedule would prevent Chabad House from being heard before Chanukah, Chabad House filed an emergency notice of appeal with this court on December 10. The next day, this court granted Chabad House's motion to intervene and stayed the injunction entered by the district court. A full opinion was issued two days later. Americans United for Separation of Church and State v. City of Grand Rapids, 922 F.2d 303 (6th Cir.1990).
 
 
 12
 On February 25, 1991, the parties filed a stipulation of facts with the district court, as summarized above. These facts were not substantially different from those that faced the district court when it initially ruled on this case. On March 21, 1991, the district court granted the plaintiffs' request for a permanent injunction preventing Grand Rapids from allowing Chabad House to erect its menorah. In doing so, the district court relied largely on its opinion of December 21, 1990. Both Chabad House and Grand Rapids appealed to this court, and all appeals were consolidated. A panel of this court affirmed the district court. Americans United for Separation of Church and State v. City of Grand Rapids, Nos. 90-2337; 91-1391/1448, 1992 WL 77643, 1992 U.S.App. LEXIS 7513 (6th Cir. Apr. 21, 1992). However, on June 25, 1992, the full court vacated the panel's decision and granted a rehearing en banc.
 
 II
 
 13
 All parties to this case agree that since Calder Plaza was opened in 1969, Grand Rapids has treated it as a traditional public forum, allowing all forms of speech and assembly. No group has ever been denied permission to use the plaza. The city's decision to treat Calder Plaza as a traditional public forum grants Chabad House significant constitutional protection. In Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court recognized that "these quintessential public forums" " 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " 460 U.S. at 45, 103 S.Ct. at 954-55 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939)). The Court held that no government may exclude speech from a traditional public forum unless "its regulation is necessary to serve a compelling state interest and ... is narrowly drawn to achieve that end." 460 U.S. at 46, 103 S.Ct. at 955; see also International Soc'y for Krishna Consciousness, Inc. v. Lee, --- U.S. ----, ----, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) ("regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny"). In this case, the plaintiffs ask the courts, rather than the local government, to regulate speech; nevertheless, the same principles apply.
 
 
 14
 Although it wishes to erect a menorah, rather than sponsor a speech, Chabad House merits the full protection of the traditional public forum doctrine. The Supreme Court has long recognized that the protection of free speech "does not end at the spoken or written word." Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). The Constitution protects any conduct that may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." Spence v. Washington, 418 U.S. 405, 409, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). The Supreme Court has extended constitutional protection to many non-verbal forms of communication. See, e.g., Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (first amendment precludes prosecution for burning an American flag); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969) (students' wearing of black armbands to protest American military involvement in Vietnam constituted protected speech).
 
 
 15
 Furthermore, Chabad House's decision to engage in religious speech does not inherently limit its freedom; religious speech and association receive the full protection of the first amendment. See Widmar v. Vincent, 454 U.S. 263, 268-69, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981); Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).[2] Justice Brennan explained this principle quite eloquently:
 
 
 16
 Religionists no less than members of any other group enjoy the full measure of protection afforded speech, association, and political activity generally. The Establishment Clause, properly understood, is a shield against any attempt by government to inhibit religion as it has done here.... It may not be used as a sword to justify repression of religion or its adherents from any aspect of public life.
 
 
 17
 McDaniel v. Paty, 435 U.S. 618, 641, 98 S.Ct. 1322, 1336, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring) (footnote omitted).
 
 
 18
 Thus, we must recognize Chabad House's rights within the public forum, whether or not their speech offends others. Over forty years ago, the Supreme Court recognized that while free speech breeds controversy, it must be protected:
 
 
 19
 [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.
 
 
 20
 Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). Furthermore, we must be particularly cautious about abridging Chabad House's right to freedom of speech in this case because of the religious content of its message. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." R.A.V. v. City of St. Paul, --- U.S. ----, ----, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) (citations omitted). The district court's decision can be affirmed, therefore, only if we are certain that the alleged constitutional violation caused by Chabad House's menorah justifies limiting its right of free speech.
 
 III
 
 21
 The plaintiffs contend that Chabad House's speech must be limited because it violates the Establishment Clause. However, since Chabad House is not a government, it cannot "establish" a religion in violation of the Constitution; Grand Rapids is the only party to this case with such power. In order to determine whether Grand Rapids has violated the Establishment Clause, we must turn to the three-part test of Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971):
 
 
 22
 First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."
 
 
 23
 (quoting Walz v. Tax Comm'n of New York City, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)) (citations omitted). Although this test has been questioned a number of times, it still appears to govern Establishment Clause cases. See Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) ("[W]e do not accept the invitation ... to reconsider our decision in Lemon v. Kurtzman....")
 
 
 24
 No one seriously questions whether the first two aspects of this test have been violated. Grand Rapids's policy of treating religious speech the same as all other speech certainly serves a secular purpose. The establishment of a public forum is a laudable goal, and part of a worthy tradition dating back to the Greek agora and the Roman forum. Furthermore, the policy avoids entangling government with religion, as no government official need decide which groups may use the plaza. Therefore, we need only decide whether the "principal or primary effect" of the public forum policy is one that "advances [or] inhibits religion."
 
 
 25
 * In Allegheny County v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), a majority of the Supreme Court adopted a test first proposed by Justice O'Connor in Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984) to answer this question.
 
 
 26
 Since Lynch, the Court has made clear that, when evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices."
 
 
 27
 492 U.S. at 597, 109 S.Ct. at 3103 (Opinion of Blackmun, J.) (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)). Justice Blackmun, who delivered the judgment of the Court in Allegheny, applied this standard to a menorah display. He explained that "[w]hile an adjudication of the display's effect must take into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to either of these religions, the constitutionality of its effect must also be judged according to the standard of a 'reasonable observer.' " 492 U.S. at 620, 109 S.Ct. at 3115 (Opinion of Blackmun, J.) (citations omitted); see also Witters v. Washington Dep't of Serv. for the Blind, 474 U.S. 481, 493, 106 S.Ct. 748, 755, 88 L.Ed.2d 846 (1986) (O'Connor, J., concurring in part and concurring in judgment). This court has also acknowledged the importance of Justice O'Connor's "reasonable observer." See ACLU of Ky. v. Wilkinson, 895 F.2d 1098, 1103 (6th Cir.1990).
 
 
 28
 Thus, in order to decide whether or not Grand Rapids has violated the Establishment Clause, we must adopt the perspective of a reasonable observer. We wish to emphasize that the endorsement test creates an objective standard, similar to the "reasonable man"[3] standard of tort law or the "reasonable person knowing all the relevant facts" who judges judicial disqualification under 28 U.S.C. § 455. Roberts v. Bailar, 625 F.2d 125 (6th Cir.1980). Accordingly, we do not ask whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think Grand Rapids endorses religion. Instead, we ask whether the reasonable observer would conclude that Grand Rapids endorses religion by allowing Chabad House's display.
 
 B
 
 29
 In attempting to define the "reasonable observer," we must look to the guidelines established by precedents both from this court and the Supreme Court. Justice O'Connor, who first promulgated the endorsement test, has emphasized that, when adopting the perspective of the reasonable observer, courts must consider all of the facts presented in each case. "Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." Lynch v. Donnelly, 465 U.S. 668, 694, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). She repeated this warning in Allegheny, noting that "the endorsement test depends on a sensitivity to the unique circumstances and context of a particular challenged practice...." 492 U.S. at 629, 109 S.Ct. at 3120 (O'Connor, J., concurring in part and concurring in the judgment).
 
 
 30
 However, Justice O'Connor has also recognized that when a court analyzes a religious display, some facts should receive greater consideration than others. For example, certain religious practices that might otherwise be unconstitutional are valid if their "history and ubiquity" would convince a reasonable observer that such practices merely represent an "acknowledgment" of religion. Thus, because of their "history and ubiquity," Justice O'Connor approved the constitutionality of legislative prayers such as those in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). She has also stated that the Establishment Clause permits "government declaration of Thanksgiving as a public holiday, printing of 'In God We Trust' on coins, and opening court sessions with 'God save the United States and this honorable court.' " Lynch, 465 U.S. at 693, 104 S.Ct. at 1369 (O'Connor, J., concurring). She repeated this reasoning in Allegheny:
 
 
 31
 It is the combination of the longstanding existence of practices such as opening legislative sessions with legislative prayers ..., as well as their nonsectarian nature, that lead me to the conclusion that those particular practices, despite their religious roots, do not convey a message of endorsement of particular religious beliefs.
 
 
 32
 492 U.S. at 630-31, 109 S.Ct. at 3121 (O'Connor, J., concurring in part and concurring in the judgment) (emphasis added). Justice O'Connor has also indicated that the reasonable observer does not evince hostility toward religion; courts must ask "what viewers may fairly understand to be the purpose of the display." Lynch, 465 U.S. at 692, 104 S.Ct. at 1369 (emphasis added).
 
 
 33
 Thus, when applying the endorsement test to this case, we must examine all the relevant facts, consider carefully the amount of weight to give each fact, and be careful to treat religious displays fairly. We must avoid hasty reliance on partial similarities between the facts at hand and those found in other cases. Even if this display appears similar in some respects to others that have been found unconstitutional in the past, other factors, unique to this case, may require us to uphold the City's decision to grant Chabad House a permit.
 
 
 34
 The plaintiffs identify several aspects of Chabad House's display that tend to support the idea that it endorses a religion. The display sends a religious message; it stands near the heart of local government; and it does not include secular symbols. Each of these facts tends to support the claim that the display violates the Establishment Clause. However, two crucial facts make this case very different from many holiday display cases: Chabad House's display is privately sponsored, and it stands in a traditional public forum to which all citizens have equal access. Although these facts are not automatically determinative, recent precedent indicates that they should carry much more weight than the details of the display emphasized by the plaintiffs.
 
 IV
 
 35
 As noted earlier, Grand Rapids has no direct connection with the Chabad House display. In fact, Grand Rapids does not even go so far as to "acknowledge" religion by permitting the menorah's display; it merely sends a message that religious groups will be treated no worse than others. Anyone familiar with Calder Plaza soon realizes that many groups use it, and that none of these groups receives special treatment from Grand Rapids. Surely a reasonable observer recognizes the distinction between speech the government supports and speech that it allows.
 
 
 36
 The courts have long recognized a clear distinction between public and private religious speech. As Justice O'Connor has stated, "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Board of Educ. of Westside Community Sch. v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (O'Connor, J.) (plurality opinion) (emphasis in original). While the Supreme Court has affirmed the rights of private groups to use public facilities to spread a religious message, see Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (overturning conviction for disorderly conduct of a Jehovah's Witness who sought to speak in a public park); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (overturning conviction of a Jehovah's Witness for using a sound amplification device in a public park without permission of the local Chief of Police), it has specifically prohibited public bodies from acting likewise. See, e.g., School Dist. of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (banning Bible reading in public schools). These cases demonstrate the critical distinction between private and public speech that must be kept in mind when applying the endorsement test.
 
 
 37
 Obviously, not all private speech automatically passes the endorsement test. In Allegheny, for example, the Supreme Court struck down a creche display sponsored by a private group. However, the Court certainly considered the private nature of the speech in question. It carefully noted that Allegheny County had granted this group special privileges by allowing it to place its creche on the Grand Staircase of the county courthouse.
 
 
 38
 The Grand Staircase does not appear to be the kind of location in which all were free to place their displays for weeks at a time, so that the presence of the creche in that location for over six weeks would then not serve to associate the government with the creche.... In any event, the county's own press releases made clear to the public that the county associated itself with the creche.... Moreover, the county created a visual link between itself and the creche: it placed next to official county signs two small evergreens identical to those in the creche display.
 
 
 39
 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50.
 
 
 40
 There is no connection between Grand Rapids and Chabad House comparable to the relationship between a government and a religious speaker found in Allegheny. Nor does it present the type of financial support for religion condemned in Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), in which the Supreme Court struck down a sales tax exemption granted by state law to religious periodicals. In fact, the plaintiffs have presented no evidence of any sub rosa attempt by Grand Rapids to encourage the menorah display, or any steps--other than its traditional public forum policy--relating to religion at all. On these facts, we must acknowledge that the display at issue is purely private, with neither overt nor covert government support, and this fact weighs heavily against a finding of endorsement.
 
 
 41
 Furthermore, the importance of the menorah's private ownership is increased in this case because of the disclaimer signs required by Grand Rapids. Although they can not be seen for as great a distance as the menorah itself, the signs make the private ownership of the menorah obvious to anyone who cares to investigate the possibility of government endorsement. Such disclaimers are not necessarily required, nor do they automatically eliminate any difficulties with the Establishment Clause. Instead, they are just one of the many factors to be considered in cases of this type. See, e.g., ACLU of Ky. v. Wilkinson, 895 F.2d 1098 (6th Cir.1990). In this case, the disclaimer signs are large enough for us to conclude that they were erected as part of a good faith effort to identify the private ownership of the menorah. Accordingly, they must be considered as another factor weighing in favor of our allowing this display.
 
 V
 
 42
 We must also recognize the significance of Grand Rapids's policy of allowing all parties to have equal access to Calder Plaza. Equal access policies provide strong protection for religious speech. One striking example of this protection is O'Hair v. Andrus, 613 F.2d 931 (D.C.Cir.1979). In Andrus, the District of Columbia Circuit held that an outdoor Mass conducted by Pope John Paul II on the National Mall did not violate the Establishment Clause. In making this decision, the court placed great weight on the government's decision to treat religious and secular speech equally in a public forum.
 
 
 43
 Religious and non-religious groups and events are treated alike. No "preference" is present. This undercuts appellants' establishment claim. When the National Mall is, as a matter of established policy, openly available on a non-discriminatory basis to the Pope, to the Reverend Moon, to Madalyn Murray O'Hair, and to all others (religionists and anti-religionists), there is no "establishment of a religion," and there cannot be a meaningful perception of one.
 
 
 44
 613 F.2d at 934. Although Andrus was decided before the Supreme Court adopted the endorsement test, the plaintiffs in that case anticipated the test and argued that allowing the Mass implied government support for Catholicism. The Andrus court strongly rejected this argument.
 
 
 45
 Appellants say that the government permit for this occurrence on the renowned National Mall sends an implied message--to the nation and to the world--of government approval (and therefore "establishment") of this church service. It implies no more approval for this church than for any other group using the Mall. The message that it does send to the world is approval of the principle of freedom of demonstration, for all groups, for all religions, even for those opposing religion.
 
 
 46
 613 F.2d at 936 (emphasis added). Furthermore, unlike the menorah in this case, which places no net cost upon Grand Rapids, the outdoor mass in Andrus forced the government to spend over $100,000 for crowd control and other functions. Even this large expense did not create an Establishment Clause violation. "[I]t is an important function of government to permit such large assemblies.... Provision of police, sanitation and related public services is a legitimate function of government and not an 'establishment' of religion." Ibid.
 
 
 47
 Andrus conclusively demonstrates the importance of a policy of equal access for all in traditional public fora. The leader of one of the world's largest faiths and 500,000 of his followers filled the National Mall, an area in which national and governmental symbols are clearly visible from every line of sight. Furthermore, in connection with the Mass, the Roman Catholic Archdiocese of Washington constructed a platform and altar, and provided "fencing, sound equipment, electrical facilities (including supplemental electric current), portable toilets, first aid stations, chairs and other physical facilities." 613 F.2d at 933. Thus, the intrusion of religion upon a public forum was much greater than any that occurs in this case. Yet once the Andrus court determined that the Pope celebrated the Mass pursuant to a policy of equal access, it was satisfied that the Establishment Clause had not been violated.
 
 
 48
 The Andrus court did not limit its holding to religious services, and clearly intended its ruling to apply to all religious speech. "The government may not allocate access to a public place available for communication among citizens on the basis of the religious content of the messages." Andrus, 613 F.2d at 935 (footnote omitted) (emphasis added). Furthermore, Andrus relied heavily upon Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), which upheld the first amendment right of Jehovah's Witnesses to address religious meetings in a public park.
 
 
 49
 The Andrus decision does not stand alone; two recent Supreme Court rulings also place great reliance on equal access policies in Establishment Clause law. In Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court held that a state university that makes its facilities generally available to student groups cannot close those facilities to student religious groups. The Court explained the distinction between allowing religious speech and endorsing that speech as follows:
 
 
 50
 [A]n open forum in a public university does not confer any imprimatur of state approval on religious sects or practices. As the Court of Appeals quite aptly stated, such a policy "would no more commit the University ... to religious goals" than it is "now committed to the goals of the Students for a Democratic Society, the Young Socialist Alliance," or any other group eligible to use its facilities.
 
 
 51
 454 U.S. at 274, 102 S.Ct. at 276 (citation and footnote omitted). The Widmar Court also emphasized that many non-religious groups were eligible to use school facilities; "[t]he provision of benefits to so broad a spectrum of groups is an important index of secular effect." 454 U.S. at 274, 102 S.Ct. at 277.
 
 
 52
 The Court expanded this finding in Board of Educ. of Westside Community Sch. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). Mergens upheld the Equal Access Act, which requires schools to give student religious groups the same access to facilities as other non-curriculum related student groups. Justice O'Connor, writing for the plurality, rejected the claim that the Act's primary effect was to advance religion:
 
 
 53
 [T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis. The proposition that schools do not endorse everything they fail to censor is not complicated.
 
 
 54
 496 U.S. at 250, 110 S.Ct. at 2372 (citations omitted) (emphasis in original). The Mergens plurality also recognized that "if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion." 496 U.S. at 248, 110 S.Ct. at 2371.[4]
 
 
 55
 Several recent cases demonstrate the broad sweep of the equal access doctrine promulgated in Mergens. See, e.g., Gregoire v. Centennial Sch. Dist., 907 F.2d 1366 (3d Cir.) (affirming an injunction requiring a high school to grant access to religious groups for discussion and worship services), cert. denied, --- U.S. ----, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990); Berger by Berger v. Rensselaer Cent. Sch. Corp., 766 F.Supp. 696 (N.D.Ind.1991) (court upheld a school's policy of permitting religious organizations to distribute religious literature in fifth-grade classrooms); Verbena United Methodist Church v. Chilton County Bd. of Educ., 765 F.Supp. 704 (M.D.Ala.1991) (court granted a preliminary injunction to plaintiffs seeking to require a school board to allow a church to rent its high school auditorium to conduct a baccalaureate service for graduating seniors). Thus, an equal access policy weighs very heavily in determining whether an endorsement of religion has occurred. We recognize that the school cases are not directly on point in this case. However, the fact that these cases involve schools rather than public areas demonstrates the breadth of their holdings, not the narrowness. Schools are not traditional public fora, and governments have much broader power over student speech than other types of private speech. "A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (citation omitted). Moreover, "[t]he Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.... Students in such institutions are impressionable and their attendance is involuntary." Edwards v. Aguillard, 482 U.S. 578, 583-84, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). "The Supreme Court has emphasized that the avoidance of religious divisiveness is nowhere more important than in public education, for '[t]he government's activities in this area can have a magnified impact on impressionable young minds....' " Mozert v. Hawkins County Bd. of Educ., 827 F.2d 1058, 1072 (6th Cir.1987) (Kennedy, J., concurring) (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985)), cert. denied, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988). See also Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2658, 120 L.Ed.2d 467 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.")
 
 
 56
 Thus, the Supreme Court's decision to uphold an equal access policy for religious speech in schools strongly indicates that we should uphold a city's equal access policy in a traditional public forum for all citizens, including those who wish to send a religious message. A reasonable observer who does not find endorsement in religious groups' use of school facilities would not find it in Chabad House's use of Calder Plaza. Those who worry about religious influence over their fellow citizens would be much less concerned about private religious activity in the Plaza than in the schools, since they know that all sorts of groups speak in the Plaza. In fact, public fora exist solely to provide a platform for speakers of all kinds.
 
 
 57
 The Supreme Court's recent decision in Lee v. Weisman, --- U.S. ----, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) does not affect this analysis. In that case, the Court held that a public school could not provide for a "non-sectarian" prayer to be given by a clergyman chosen by the school at graduation ceremonies. However, the Court carefully distinguished that case from Mergens:
 
 
 58
 We recognize that ... there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students. See Westside Community Bd. of Ed. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). But these matters, often questions of accommodation of religion, are not before us. The sole question presented is whether a religious exercise may be conducted at a graduation ceremony in circumstances where, as we have found, young graduates who object are induced to conform.
 
 
 59
 --- U.S. at ----, 112 S.Ct. at 2661. Thus, Weisman provides little support for the plaintiffs. In fact, the Weisman Court recognized that " '[t]he First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact.' " --- U.S. at ----, 112 S.Ct. at 2661 (quoting School Dist. of Abington v. Schempp, 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring)) (emphasis added). We are confident that the display in this case neither creates a realistic danger of oppressing non-believers, nor has a meaningful and practical detrimental impact on the lives of those who will see the menorah.
 
 
 60
 We also reject the plaintiffs' argument that the menorah display violates the Establishment Clause because it stands alone. They suggest that while a candle-lighting ceremony in Calder Plaza would be acceptable, an unattended menorah might mislead a reasonable observer into believing that the government was speaking rather than a private group.[5] As noted above, however, Widmar and Mergens are not strictly limited to their facts. Instead, they represent a broad policy of tolerance for equal access policies in Establishment Clause jurisprudence. The plaintiffs' argument also seems to rest on the assumption that the menorah constitutes only a religious symbol that remains after Chabad House has finished its speech. But this assumption is wrong; Chabad House's menorah display is no mere remnant of religious speech, it is religious speech and must receive the same respect as a round-the-clock Bible reading. It would be strange for a reasonable observer to find more endorsement in a menorah standing alone than in a menorah accompanied by a Torah reading or by crowds of people celebrating Chanukah with games or feasts. The menorah display constitutes religious speech just as much as a meeting of a school Bible club or a Mass presided over by the Pope. Therefore, this case must be governed by Andrus, Widmar, and Mergens.
 
 
 61
 Furthermore, the plaintiffs' argument forces Chabad House's freedom of speech to depend on the actions of third parties. The only reason that the menorah stands alone is that the City has received no other requests for permits during the holiday season. The record conclusively demonstrates that neither Chabad House nor Grand Rapids has sought to discourage other displays. It makes no sense to rule that others can veto Chabad House's freedom of speech by abstaining from speech.
 
 
 62
 Obviously, the fact that the menorah stands unattended for most of eight days may have some effect on our conclusion as to whether Grand Rapids has endorsed religion. However, in this case, that fact is simply overwhelmed by Calder Plaza's status as a traditional public forum. To a reasonable observer, no display actually stands alone in this public forum. In the mind's eye, the reasonable observer sees the menorah display as but one of a long series that has taken place since the Plaza was opened. The reasonable observer knows that other speakers have used the Plaza before, and will do so again. Instead of concluding that religious zealots have stormed the gates with the city's endorsement, the reasonable observer recognizes this display as yet another example of free speech.
 
 VI
 
 63
 In reaching our decision, we reject the definition of the reasonable observer posited by the plaintiffs and the dissent. The plaintiffs' brief gave no explicit definition of the reasonable observer, relying instead on the general principle that the government's actions must not convey a message of endorsement. At oral argument, however, counsel for the plaintiffs fleshed out the parameters of their "reasonable observer," in terms of a person who knows enough to infer government endorsement, but not enough to understand why there is none. The dissent, at page 1558, postulates a slightly different reasonable observer, one who, while his faculties of ratiocination may be intact, is stated to have no knowledge beyond what appears upon seeing the menorah, whereupon the "observer must be left to draw his or her own conclusions from the vista presented at the time." (emphasis in original)
 
 
 64
 The "reasonable observer" explicated at oral argument by the able and candid counsel for the plaintiffs strikes us as unreasonable. For example, the plaintiffs' observer does not follow local politics or controversies, or read the newspapers where this issue has been discussed. However, the plaintiffs' observer does go downtown where the menorah can be seen. In fact, the plaintiffs' observer must come close enough to recognize that the menorah is placed in Calder Plaza. The menorah can be seen from several blocks away, and from that distance it may not be obvious that the menorah is on public ground. From some perspectives, the menorah would appear little different than if it were actually standing on one of the private plazas that border the Calder Plaza area.
 
 
 65
 Furthermore, the plaintiffs' observer must come close enough to realize that there are no persons associated with the menorah. Counsel for the plaintiffs, and the majority of the panel that ruled in the plaintiffs' favor, concede that if religious services or ceremonies were going on at the base of the menorah, then no endorsement could reasonably be perceived. This concession implies that the observer comes closer than the maximum sight-line distance of the menorah itself, because the menorah is clearly visible from distances and angles from which any persons accompanying the menorah would not be visible. However, the plaintiffs' observer must not come close enough to the menorah to read the sign. Counsel for the plaintiffs conceded at oral argument that if the observer reads the sign, and acts reasonably, the observer must conclude that no endorsement of religion has occurred.[6] Indeed, counsel for the plaintiffs himself indicated that he and his clients agree that Grand Rapids is not actually endorsing religion, although they do argue that a reasonable observer would (not just could ) think so. We simply cannot agree with the plaintiffs' characterization of the appropriate limitations on the knowledge,[7] location and perspective (both literal and figurative) of a reasonable observer. The plaintiffs appear to be asking what an unreasonable person could think of the display, rather than what a reasonable person would think.
 
 
 66
 In reaching our decision, we decline the invitation to follow several cases cited by the plaintiffs. In Smith v. Albemarle County, 895 F.2d 953 (4th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990), a divided panel of the Fourth Circuit held that a creche erected by Jaycees on the front lawn of a county office building violated the Establishment Clause. There are significant differences between Smith and this case. The Smith display was approved by a special vote of the County's Board of Supervisors, rather than being allowed pursuant to a long-established policy like the menorah in this case. Furthermore, unlike Calder Plaza, which regularly features all types of activities, the lawn in Smith had been used only "sporadically for occasional activities...." 895 F.2d at 955. In fact, although the Smith court treated the lawn as a traditional public forum, it acknowledged that "[t]he front lawn though used for such events as weddings and concerts does not have the traditional indicia of a free speech forum associated with a public park." 895 F.2d at 958 n. 5. Because we must consider all the facts in each case and avoid drawing false parallels, these distinctions are significant. Citizens of Grand Rapids have become accustomed to the free use of Calder Plaza and should know that events taking place there are not necessarily supported by the city. The county lawn in Smith, on the other hand, was rarely used for such events, which could have made the county's citizens more likely to draw a connection between those who spoke on the lawn and those who allowed them to speak. Because the endorsement test places great weight on the reasonable observer's perception of the speech in question, this distinction could easily justify different results in Smith and this case. However, even if Smith were exactly on point with this case, we believe that the Smith court simply erred by minimizing the importance of an equal access policy. We choose to avoid that error, rather than repeat it.
 
 
 67
 The plaintiffs also rely on Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir.1989), cert. denied, 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990), a case given great weight by the district court. In that case, the Second Circuit rejected an unattended, solitary display of a large menorah in City Hall Park. It rejected the public forum argument made here, because it feared that "the public forum doctrine would swallow up the Establishment Clause." Id. at 1029. Furthermore, it noted that "[o]ther than the menorah in question, no permits had been issued for the unattended display of any religious symbol in the Park." Ibid. It also stated that "[t]he existence of a public forum is simply a factor to be taken into account in determining whether the context of the display suggests government endorsement." Ibid. Judge Meskill dissented, arguing that the case should be governed by Widmar v. Vincent. The Second Circuit later re-affirmed its decision in a case involving the same parties and only slightly different facts. Chabad-Lubavitch of Vt. v. City of Burlington, 936 F.2d 109 (2d Cir.1991) (Chabad proposed moving the menorah further away from City Hall and placing it near two signs that sent a secular holiday message), cert. denied, --- U.S. ----, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992).
 
 
 68
 However, this court has criticized Kaplan heavily on several occasions. In ACLU of Ky. v. Wilkinson, 895 F.2d 1098, 1102 (6th Cir.1990), this court stated that "Judge Meskill's dissent [in Kaplan ] strikes us as persuasive...." In an earlier stage of this case, this court specifically endorsed Judge Meskill's reasoning. Americans United for Separation of Church and State v. City of Grand Rapids, 922 F.2d 303, 309 (6th Cir.1991) ("On our tentative view of the merits, we believe Judge Meskill had it about right....") Finally, in Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 462 (6th Cir.1991), this court noted that "in the [Grand Rapids] case we stated that we did not believe that [Kaplan ] was the law in our circuit." Thus, in three separate cases, we have indicated our general disagreement with Kaplan. Furthermore, in light of the above discussion of Widmar and Mergens, it is clear that Kaplan simply misconstrues the endorsement test.
 
 
 69
 Instead of adhering to Smith and Kaplan, we agree with the Seventh Circuit's analysis in Doe v. Small, 964 F.2d 611 (7th Cir.1992) (en banc), a case very similar to this one. In Small, the City of Ottawa, Illinois had been enjoined from allowing anyone to display a series of religious paintings in a local public park that had long served as a traditional public forum. Sitting en banc, the Seventh Circuit reversed. It reasoned as follows:
 
 
 70
 Since the State of Missouri's desire [in Widmar ] to achieve greater separation of church and state than provided for under the Establishment Clause was an insufficient interest to justify a content-based exclusion of religious speech in the limited public forum of a state university, we fail to comprehend how the Establishment Clause could constitute a sufficiently compelling state interest to justify a content-based exclusion of private religious speech in a quintessential public forum. Thus, we hold that the district judge erred in finding that the Establishment Clause provided a sufficiently compelling interest to justify a content-based exclusion of speech from Washington Park. The City of Ottawa may not exclude private persons from Washington Park merely because of the religious content of their speech.
 
 
 71
 964 F.2d at 618-19 (emphasis in original).
 
 
 72
 The plaintiffs attempted to distinguish Small on the grounds that the park in question was "well removed from the seat of the City government; City Hall is some three blocks away, and no City buildings border the park." 964 F.2d at 613. However, while these facts strengthen a finding of no endorsement, other facts tend to make Small appear a much stronger case for endorsement than this case. While the menorah stands for eight days, the paintings have occupied space in the park for an average of two months per year, and permanent supports have now been erected for them. 964 F.2d at 613 n. 3. Furthermore, the Ottawa City Council passed a resolution in 1986 stating that "this council endorses the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing [the paintings] and incorporating them in the overall Christmas display that annually graces the downtown area of the City...." 964 F.2d at 616 (emphasis added). Thus, the connection between Ottawa and the Jaycees was much closer than any relationship between Grand Rapids and Chabad House in this case.
 
 
 73
 Nevertheless, we believe these are distinctions without a difference; the crucial facts in both Small and this case are that a private group is erecting a display in a traditional public forum. These facts are not automatically determinative. Tricky questions could arise if there is a claim that the public forum has not been equally open to all, that an ostensibly neutral restricting criterion actually discriminates among viewpoints, or that there is some government collusion in an ostensibly private display. However, no such questions exist in this case. Grand Rapids has made a consistent, even noble, effort to open the Plaza to as wide a range of speakers as possible. For a number of years, the city has followed its policy of equal access rigorously, with an admirable neutrality that insures that no viewpoint has received any advantages over any other.
 
 
 74
 In its brief and at oral argument, Grand Rapids reiterated its commitment to allowing all points of view to be represented in the Plaza. Despite a rain of hypothetical questions from the bench, counsel for Grand Rapids did not deviate from affirming that Grand Rapids would allow other viewpoints equal access, even if such displays were unpopular (for example, erecting a swastika on Adolf Hitler's birthday) or stood for an extended period of time. A case can be made that such an enlightened attitude might be difficult to maintain if a political controversy arose. See, e.g., Collin v. Smith, 578 F.2d 1197 (7th Cir.) (upholding right of Nazis to march in Skokie, Illinois), cert. denied, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). If a case of this type arose, with specific facts that showed favorable treatment of a religious message, then an Establishment Clause challenge might carry more weight. However, on the facts in this case, no such challenge is tenable.
 
 
 75
 A ban on religious expression in the public forum, even if limited to a ban on expression by signs and symbols, would lead to impossible difficulties. Under established doctrine, the ban could hardly be limited to pro-religious expression; it would have to extend to anti-religious expression as well. "State power is no more to be used so as to handicap religions, than it is to favor them." Everson v. Board of Educ. of Ewing Township, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947). As counsel for plaintiffs correctly asserted at oral argument, under the plaintiffs' principle a banner reading "Cure AIDS, smash the Catholic Church" would be banned, while one reading "Cure AIDS, support research" could not be banned. We do not read the Establishment Clause to place such a heavy burden on freedom of speech.
 
 
 76
 Thus, we rule in favor of Grand Rapids and Chabad House, because we hold that truly private religious expression in a truly public forum cannot be seen as endorsement by a reasonable observer. This holding does not mean that an equal access policy in a public forum "trumps" the Establishment Clause, or that the Establishment Clause does not apply to such a situation. A government cannot avoid the legal questions in this area of the law simply by designating a particular place as a public forum. Additional facts may belie the label, and thus undermine a government's reliance on our holding. However, if such additional facts are not forthcoming, and the evidence indicates that an area actually is a traditional public forum, then private groups may express a religious message without a reasonable observer inferring public support of the message. Those who oppose such practices are free to express their own beliefs and to take their case to the citizens of the community rather than to the courts.
 
 
 77
 We must remember, when applying the endorsement test, that the reasonable observer is "objective." See Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 711, 105 S.Ct. 2914, 2918, 86 L.Ed.2d 557 (1985) (O'Connor, J., concurring). Thus, the reasonable observer does not look upon religion with a jaundiced eye, and religious speech need not yield to those who do. Great defenders of free speech, such as Professor Harry Kalven, have written of the dangers to free speech posed by the "Heckler's Veto," an attempt by those who dislike a speaker to create such a disturbance that the speaker must be silenced.[8] By and large, however, the courts have recognized that we cannot allow the right of free speech to be restricted based on the hostile reaction of those who disagree with it. "Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence." Brown v. Louisiana, 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 719 n. 1, 15 L.Ed.2d 637 (1966).
 
 
 78
 This case presents another challenge to the right of free speech from those who do not like the message at issue or the manner in which it is presented. We believe that the plaintiffs' argument presents a new threat to religious speech in the concept of the "Ignoramus's Veto." The Ignoramus's Veto lies in the hands of those determined to see an endorsement of religion, even though a reasonable person, and any minimally informed person, knows that no endorsement is intended, or conveyed, by adherence to the traditional public forum doctrine. The plaintiffs posit a "reasonable observer" who knows nothing about the nature of the exhibit--he simply sees the religious object in a prominent public place and ignorantly assumes that the government is endorsing it. We refuse to rest important constitutional doctrines on such unrealistic legal fictions. See Doe v. Small, 964 F.2d 611, 630 (7th Cir.1992) (Easterbrook, J., concurring) (refusing to allow "an obtuse observer's veto, parallel to a heckler's veto over unwelcome political speech.")
 
 VII
 
 79
 Finally, we wish to emphasize that our holding, while it gives significant protection to private religious speakers, does not require governments to allow all such speakers to speak in any manner whatsoever in a public forum. Private groups might be seen as exceeding that protection by seeking to make their displays permanent, by erecting displays so large as to be dangerous, or by otherwise monopolizing the forum. However, governments have ample avenues of protection from such possibilities. "[T]he government may enforce reasonable time, place and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' " United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). Thus, Grand Rapids could, if it chose, probably limit the height or length of time of displays or rallies, or even ban all unattended displays, if done evenhandedly. See Chabad Lubavitch of Ga. v. Harris, 752 F.Supp. 1063 (N.D.Ga.1990) (state policy prohibited placement of any object on state capitol grounds by members of the public); Lubavitch of Iowa, Inc. v. Walters, 684 F.Supp. 610 (S.D.Iowa 1988), aff'd, 873 F.2d 1161 (8th Cir.1989) (requiring plaintiffs to remove menorah at close of services was consistent with state policy that there be a thorough cleanup after event is concluded).
 
 VIII
 
 80
 What the members of Chabad House seek in this court is fully consistent with, and does not violate, our traditional division between church and state. They are neither interfering in city functions, nor trying to bend the city to their will. They seek nothing that this court would not readily compel the city to grant to any secular group in similar circumstances. They merely ask that they not be spurned because they choose to praise God. Instead of forcing them to remain on the sidelines, our Constitution offers them a platform from which to proclaim their message. In the traditional public forum, as at the ballot box, all citizens are insiders as they seek to influence our civic life.
 
 
 81
 When it granted Chabad House's permit, Grand Rapids stayed firmly on its side of the wall separating church and state. It acted merely as the referee and arbiter of the public space, rather than becoming a participant or combatant in the melee of ideas and expression that characterizes America at its best. As Justice Brennan has stated:
 
 
 82
 The antidote which the Constitution provides against zealots who would inject sectarianism into the political process is to subject their ideas to refutation in the marketplace of ideas and their platforms to rejection at the polls. With these safeguards, it is unlikely that they will succeed in inducing government to act along religiously diverse lines, and, with judicial enforcement of the Establishment Clause, any measure of success they achieve must be short-lived, at best.
 
 
 83
 McDaniel v. Paty, 435 U.S. 618, 642, 98 S.Ct. 1322, 1336, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring). Thus, we hold that Chabad House's exercise of its freedom of speech does not violate the Establishment Clause, and REVERSE the judgment of the district court.
 
 
 84
 BOYCE F. MARTIN, JR. Circuit Judge, dissenting.
 
 
 85
 I join Judge Lively's dissent from the opinion of the court. I would go further, however, and delineate once and for all what is acceptable and what is not acceptable when free speech collides with freedom from government endorsement of religion.
 
 
 86
 The First Amendment does not confer absolute rights of freedom of speech. Reasonable restraints on time, place, and manner of speech in public forums are upheld as long as the restrictions are necessary to achieve a valid state purpose. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984). Government regulation of speech in public forums is permissible if it is content neutral, is narrowly tailored to serve a significant government interest, and leaves open ample alternate channels of communication. Id. Freedom from governmental endorsement of any religion is a valid state purpose, which in this case could be implemented by refusing to allow religious groups to leave religious symbols in Calder Plaza. In my opinion, such a restraint is appropriate. Yet the majority opinion rejects this solution out of hand.
 
 
 87
 My saddest objection to the majority opinion is that it overrules without explanation our prior decisions in ACLU v. City of Birmingham, 791 F.2d 1561 (6th Cir.), cert. denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); ACLU v. Wilkinson, 895 F.2d 1098 (6th Cir.1990); Doe v. City of Clawson, 915 F.2d 244 (6th Cir.1990); Grand Rapids I, 922 F.2d 303 (6th Cir.1990); and Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458 (6th Cir.1991).
 
 
 88
 The majority opinion opens every downtown public park to any form of religious symbol. In this case, a purely religious symbol was left unattended in a public park. The disclaimers were of little value. The majority upholds the right of private parties to leave religious symbols throughout the park on any occasion as an element of free speech. Because different religions celebrate various events in their religious year at different times, Calder Plaza could be filled with religious items year round. These religious symbols may, and probably will, give the impression that the city of Grand Rapids endorses some religion. As Judge Lively argues so well in his dissenting opinion, such an impression was created by the menorah in this case. The city simply cannot allow anyone to place religious symbols in Calder Plaza if those symbols leave that impression that the city endorses religion. The First Amendment protects Chabad House's right to say anything it wants to say in Calder Plaza, but the First Amendment does not mandate allowing Chabad House to leave a religious symbol, which creates the appearance of government-endorsed religion, on the square.
 
 
 89
 Judge Lively's quote from Justice Stevens' opinion in Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 650-51, 109 S.Ct. 3086, 3131-32, 106 L.Ed.2d 472 (1989) (Stevens, J., concurring in part and dissenting in part), reflects my belief as well as it can be written. Thus, I respectfully dissent.
 
 
 90
 LIVELY, Senior Circuit Judge, dissenting.
 
 
 91
 The First Amendment enshrines values and guarantees that lie at the core of individual human liberty. This is true whether the various clauses are considered individually or together. Yet, there is inherent in this grouping of several absolute commands a potential for conflict between two or more of them. This case concerns a conflict between the Establishment Clause and the Free Speech Clause. In my opinion, the court has reached the wrong answer in attempting to resolve this conflict.
 
 
 92
 There is no dispute that the display of a menorah is symbolic "speech" under the First Amendment. What is in dispute is whether the City of Grand Rapids violated the Establishment Clause by permitting Chabad House to erect the twenty-foot high steel menorah at a conspicuous place on Calder Plaza and leave it unattended for the eight days of the Jewish holiday of Chanukah. The majority opinion finds no violation in this case essentially for three reasons.
 
 
 93
 In the first place, the majority finds that only a resident of Grand Rapids who knows that Calder Plaza is a public forum open to all speakers and who has lived there long enough to have known and observed the various activities that have occurred there qualifies as "the reasonable observer." I believe this definition of a reasonable observer is far too narrow.
 
 
 94
 Next, the majority concludes that because Calder Plaza is a public forum, the Free Speech Clause of the First Amendment requires that it permit all speech there, secular and religious alike. In effect, this is an interpretation that requires the Establishment Clause always to yield to the Free Speech Clause when the two are in conflict. To me, this is an erroneous interpretation of First Amendment law.
 
 
 95
 Finally, the majority opinion appears to find constitutional significance in the fact that Chabad House is a private organization, not an arm of government. Obviously, the First Amendment only addresses official action. The Supreme Court has made it abundantly clear, however, that a government violates the Establishment Clause by permitting a private party to erect and maintain religious symbols on public property if the effect of such a display is to give the impression that the government, either intentionally or unintentionally, endorses or supports the religious message that the private group seeks to convey.
 
 
 96
 I disagree with all three major premises of the majority opinion for the reasons that follow, and respectfully dissent.
 
 I.
 A.
 
 97
 The question of whether a governmental unit violates the Establishment Clause by permitting a private religious organization to display religious symbols or engage in other religious exercises on public property depends upon the facts and circumstances in each case where the activity is challenged. Chief Justice Burger stated for the Court in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984):
 
 
 98
 In each case, the inquiry calls for line-drawing; no fixed, per se rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute." Walz [v. Tax Comm., 397 U.S. 664], 668 [90 S.Ct. 1409, 1411, 25 L.Ed.2d 697] [1970]. The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." Lemon, 403 U.S. at 614 [91 S.Ct. at 2112].
 
 
 99
 Id. 465 U.S. at 678-79, 104 S.Ct. at 1362. Justice O'Connor echoed that same thought in her separate opinion in Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989):
 
 
 100
 Judicial review of government action under the Establishment Clause is a delicate task. The Court has avoided drawing lines which entirely sweep away all government recognition and acknowledgement of the role of religion in the lives of our citizens for to do so would exhibit not neutrality but hostility to religion. Instead the courts have made case-specific examinations of the challenged government action and have attempted to do so with the aid of the standards described by Justice Blackmun in Part III-A of the Court's opinion. (describing the Lemon test).
 
 
 101
 Id. at 623, 109 S.Ct. at 3115 (O'Connor, J., concurring). In the most recent Establishment Clause case from the Supreme Court, Justice Kennedy wrote that "[o]ur Establishment Clause jurisprudence remains a delicate and fact-sensitive one...." Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2661, 120 L.Ed.2d 467 (1992).
 
 B.
 
 102
 The statement of facts in the majority opinion is essentially accurate. There are certain facts, however, that lead me to conclude there was an Establishment Clause violation in this case.
 
 
 103
 Calder Plaza is much more associated with government than an ordinary city park. In fact, the presence of government is pervasive. The City filed exhibits with its brief consisting of a plat showing the location of the menorah in relation to the various government buildings and several photographs of the menorah in place. The surrounding buildings house the core functions of local and state government units. The photographs, taken from eye level, show the menorah from different angles with different government buildings in the background. In each picture the menorah dominates the view, and the buildings serve as a backdrop. The total effect is overwhelming; for these eight days nothing else in or upon this government square captures the eye of an observer like this religious symbol. The two City exhibits are filed as an Appendix to this opinion.
 
 
 104
 The majority opinion appears to concede this much, as indeed it must, but says this strong visual impression is totally neutralized by the two-foot by three-foot sign on each side of the menorah. They call the sign a "disclaimer," but that is not all it is. As the City's photographs show, the sign, at the very top and in much larger letters than the disclaiming language, conveys a greeting related to the religious holiday it celebrates:
 
 HAPPY CHANUKAH TO ALL
 
 105
 This Menorah display has been erected by Chabad House, a private organization. Its presence does not constitute an endorsement by the City of Grand Rapids of the organization or the display.
 
 
 106
 Judge Cornelia Kennedy admirably summarized the scene presented by this particular menorah in this particular place, and its appearance to a reasonable observer, in her concurring opinion for the original panel that heard this case:
 
 
 107
 We have here a public forum provided by the government in which some speech, the Calder sculpture, is in some fashion endorsed by the government, and other speech, the menorah, is not readily identifiable as not being endorsed or promulgated by that same government. In light of the overwhelming size and permanent appearance of the menorah, and the absence of identifiable responsible parties for twenty-three hours a day, it is not unreasonable for a neutral observer, with no knowledge of the respective religious communities' representations and no knowledge of the permit requirements, to conclude that it may in fact be a government display. In fact, for twenty-three hours a day the only distinction between the Calder sculpture and the menorah in the eyes of a reasonable observer is the disclaimer sign.
 
 
 108
 In this case, the disclaimer is clearly inadequate to its task. The disclaimer is not at all visible to the majority of the audience of the speech. As noted by the majority opinion, the most visible part of the disclaimer is in fact not a disclaimer at all, but rather more religious speech. The actual dissociative message of the disclaimer is not available to the vast majority of the audience of the symbolic speech, and therefore cannot redeem it. I do not think it necessary to address all the possible relative size and viewing combinations with respect to the symbolic speech's audience and the disclaimer's audience, but I have no trouble concluding that in light of the many factors lending credence to an inference that the menorah is government speech, this disclaimer is inadequate.
 
 
 109
 A reasonable observer of Calder Plaza, seeing a seemingly permanent and orphan sculpture at one end and a similarly permanent and orphan religious symbol at the other end, could easily infer that Grand Rapids has, for whatever reason, decided to participate in the Chanukah celebration. This appearance of an endorsement, however unintended, violates the establishment clause.
 
 
 110
 Americans United for Separation of Church and State v. City of Grand Rapids, Nos. 90-2337; 91-1391/1448, slip op. at 33-34, 1992 WL 77643 (6th Cir. Apr. 21, 1992).
 
 II.
 A.
 
 111
 The majority opinion argues that the plaintiff's definition of "the reasonable observer" is too broad and that in effect, it permits a "Heckler's Veto" or an "Ignoramus's Veto."[1] I disagree. To the majority, only a resident of Grand Rapids who is familiar with the details of the city's policy for use of Calder Plaza, and in fact, knows that many other organizations have used it as a public forum qualifies as "the reasonable observer." I find this definition much too narrow.
 
 
 112
 To me, any reasonably well-informed person who happens to pass Calder Plaza during the time the twenty-foot high unattended menorah occupies the place shown in the photographs qualifies as a reasonable observer. That observer might be a passer-through or a passer-by. The reasonable observer does not have to be familiar with Grand Rapids' religious demographics, the city's regulations regarding use of the plaza, or past uses to which it has been put. This observer must be left to draw his or her conclusions from the vista presented at the time.
 
 
 113
 The majority opinion seeks to strengthen its reasonable observer argument by stating that anyone interested enough to investigate would read the small "disclaimer" sign and know that there was no endorsement by the City of Chabad House's display. Again, I disagree. All the sign can inform an observer is that the City intends no endorsement. If the menorah sends a message of endorsement, the intent of the parties is irrelevant.
 
 
 114
 Counsel for Chabad House argued before the en banc court that no reasonable observer would believe that Grand Rapids, a predominantly Christian community, would endorse the faith of a very small group of its non-Christian citizens. Of course, the Establishment Clause is no less a prohibition against governmental endorsement of a minority religion than of the religion of the majority. It prohibits endorsement or support of any religion. It requires absolute neutrality in all matters religious.
 
 B.
 
 115
 The majority opinion seeks to satisfy this constitutional requirement of neutrality by pointing out that the City is neutral as regards all "speakers" who desire to use the plaza, secular and religious alike. If the only issue in the case were free speech, that would be answer enough. By ignoring the constitutional significance of religious speech, however, the majority opinion reaches the unsustainable conclusion that because Calder Plaza is a public forum, no speech can be excluded on the basis of its content. Indeed, despite its statement to the contrary, the majority opinion does have the effect of holding that the public forum concept "trumps" the Establishment Clause in a case such as this.
 
 
 116
 Justice Kennedy described the relationship between protection of speech and religion under the First Amendment in Lee v. Weisman:
 
 
 117
 The First Amendment protects speech and religion by quite different mechanisms.
 
 
 118
 * * * * * *
 
 
 119
 The Free Exercise Clause embraces a freedom of conscience and worship that has close parallels in the speech provisions of the First Amendment, but the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions. (citations omitted).
 
 
 120
 --- U.S. at ---- - ----, 112 S.Ct. at 2657-58. What this relationship requires, of course, is accommodation. The majority would require the Establishment Clause always to yield to, or accommodate the Free Speech Clause as exemplified by the public forum doctrine. I believe the accommodation should be the other way around, because as Justice Kennedy recognized, the Establishment Clause stands apart within the First Amendment as a specific prohibition against certain state activities, and there is no exact counterpart in the speech provisions. Thus, I believe that the public forum concept must accommodate the proscriptions of the Establishment Clause.
 
 
 121
 Justice Kennedy dealt with conflicts between the free speech guarantee and other constitutional rights in Burson v. Freeman, --- U.S. ----, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). Concurring in the opinion of the Court, he stated:
 
 
 122
 Under what I deem the proper approach, neither a general content-based proscription of speech nor a content-based proscription of speech in a public forum can be justified unless the speech falls within one of a limited set of well defined categories.
 
 
 123
 * * * * * *
 
 
 124
 As I noted in Simon & Schuster [Inc. v. Members of New York State Crime Victims Board ] [--- U.S. ----, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)], there is a narrow area in which the First Amendment permits freedom of expression to yield to the extent necessary for the accommodation of another constitutional right. A conflict with the Establishment Clause is one of those "well defined categories"--a "narrow area in which the First Amendment permits freedom of expression to yield to the extent necessary for the accommodation of another constitutional right." (citations omitted).
 
 
 125
 Id. at ---- - ----, 112 S.Ct. at 1858-59.
 
 
 126
 We are not constituted to decided hypothetical cases or render advisory opinions to governments. On the facts of this case, the large unattended menorah at this location would send a message of endorsement or support to a reasonable observer. Thus, the district court correctly held that the public forum concept must yield to the prohibition of the Establishment Clause.
 
 C.
 
 127
 In addition to its treatment of the "reasonable observer" requirement and its emphasis on the fact that Calder Plaza is a public forum, the majority opinion makes much--too much, I believe--of the fact that the "speech" involved here is that of a private group rather than speech made directly by the City. The opinion appears to argue either that the Establishment Clause applies only when the government itself is the speaker, or that its prohibition is less absolute when a private party or organization speaks under circumstances in which government support may be inferred. That reading of the First Amendment is too narrow under existing precedents. Justice Blackmun wrote for the Court in Allegheny County:
 
 
 128
 But the Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations. See, e.g., Texas Monthly, Inc. v. Bullock, 489 U.S. 1 [109 S.Ct. 890, 103 L.Ed.2d 1] (1989) (government support of the distribution of religious messages by religious organizations violates the Establishment Clause). Indeed, the very concept of "endorsement" conveys the sense of promoting someone else's message. Thus, by prohibiting government endorsement of religion, the Establishment Clause prohibits precisely what occurred here: the government's lending its support to the communication of a religious organization's religious message.
 
 
 129
 492 U.S. at 600-01, 109 S.Ct. at 3105. It is clear that a government's support and promotion of a private organization's religious communications violate the Establishment Clause.
 
 
 130
 The majority opinion relies upon the Supreme Court's reference to the "crucial difference" between government and private speech endorsing religion in Bd. of Educ. of Westside Community Sch. v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990). The Court in Mergens did not hold or intimate that government action that supports or endorses private organizations' religious communications can never run afoul of the Establishment Clause. The quotation merely expressed the truism that private religious expressions are not affected by the Establishment Clause absent some governmental act of support or promotion.
 
 III.
 
 131
 I believe the majority opinion's reliance upon Mergens, Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and other decisions not involving religious symbols on publicly owned property is misplaced. Since the Supreme Court's decisions in Lynch and Allegheny County we have a well-defined body of law dealing with the specific problem presented by this case. Although cases involving different First Amendment disagreements may provide general principles, the Supreme Court has now given us a definitive test to apply to the specific issue that arises from the governmental practice of permitting displays of religious symbols in settings intimately associated with government. Justice O'Connor stated the test in her separate concurrence in Lynch, where she wrote:
 
 
 132
 What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion. It is only practices having that effect, whether intentionally or unintentionally, that make religion relevant, in reality or public perception, to status in the political community.
 
 
 133
 465 U.S. at 692, 104 S.Ct. at 1369. What the government must avoid is sending "a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Id. at 688, 104 S.Ct. at 1367. A majority of the Supreme Court adopted the endorsement standard in Allegheny County. 492 U.S. at 597, 109 S.Ct. at 3103.
 
 A.
 
 134
 The majority opinion's heavy reliance on Mergens, a case decided under a statute, to support its view that a requirement of equal access to a public forum has constitutional primacy over the Establishment Clause is typical of its misapplication of precedent to the facts of this case. The issue in Mergens, from which the majority draws its open forum argument, was whether, under the federal Equal Access Act, a government agency--a high school--could constitutionally deny a private group use of school facilities after instructional hours to conduct a meeting involving religious expression. When the meeting ended, no religious symbols were left behind. Only after finding that the school board's action in complying with the Equal Access Act did not amount to an endorsement of religion did the Court hold that use of the facilities for that purpose could not be denied because the school was a limited public forum. There was no intimation that if the Court had ruled otherwise on the endorsement question the public forum doctrine would have required permission to use the facilities despite the fact that such use would have violated the Establishment Clause.
 
 
 135
 Similarly, I believe that reliance upon such decisions as O'Hair v. Andrus, 613 F.2d 931 (D.C.Cir.1979) is also misplaced. The facts of O'Hair relate in no way to the facts of the present case. It involved a single religious ceremony on the Mall in Washington by the Pope. When the Catholic Mass was over the Pope departed and all vestiges of the event were removed. The O'Hair court stated that its holding was controlled by its own previous decision in A Quaker Action Group v. Morton, 516 F.2d 717 (1975), and Allen v. Morton, 495 F.2d 65 (1973). O'Hair was decided long before Lynch and Allegheny County and does not mention, much less rely upon, the issue of endorsement. Finally, as the decision of another court of appeals that was never reviewed by the Supreme Court, O'Hair has no binding effect on this court.
 
 
 136
 Both Mergens and O'Hair concerned discrete meetings of short duration conducted by religious groups. If the sponsoring group of the religious discussions in Mergens had erected and left unattended for a period of time a large religious sign in front of the school, or in the classroom, I believe Lynch and Allegheny County would require a different result. These decisions would surely have required a different result if the religious group that sponsored the Pope's appearance had left behind at the place on the Mall where the Mass was celebrated, a lighted twenty-foot high cross or crucifix.
 
 B.
 
 137
 Of other post-Lynch and Allegheny County cases at the court of appeals level, the majority opinion appears to embrace Doe v. Small, 964 F.2d 611 (7th Cir.1992), with the greatest enthusiasm. In fact it describes Doe v. Small as "a case very similar to this one." This description overlooks several critical facts that distinguish that case from the present one. First, the Doe v. Small opinion states that the religious paintings were displayed by the Jaycees in Washington Park, "a quintessential public forum well removed from the seat of the City government; City Hall is some three blocks away, and no City buildings border the park. " 964 F.2d at 613 (italics supplied). This language hardly describes a setting "very similar" to Calder Plaza. Second, when the district court in Doe v. Small granted an injunction prohibiting the display, the City did not appeal. The issue before the en banc court of appeals was whether the injunction against the Jaycees was too broad. In describing the issues on appeal, Judge Coffey stated, "We need not and will not address the issue of whether the City of Ottawa endorsed the Jaycees' religious speech because the City has not appealed." Id. at 617. Thus, what is the critical issue in the present case was neither addressed nor decided in Doe v. Small. The case is no precedent at all for this court. What the majority opinion does is quote dicta by various members of the Doe v. Small court found in four separate opinions, while ignoring those facts which deprived the decision of any true precedential value in our case.
 
 
 138
 If we are to look to decisions from other circuits for guidance, it seems to me that post-Lynch and Allegheny County cases from the Second and Fourth Circuits should provide that guidance. In Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir.1989), the court held that permitting a private group to erect a sixteen-foot high menorah in a city park in front of city hall for the period of Chanukah violated the Establishment Clause. Judge Feinberg analyzed Allegheny County in depth, and related the holdings of that case to the one before the court. As in the present case, the attorneys for the City and the private group that had erected the symbol argued that because City Hall Park was a traditional public forum, the City could not deny the private group's request to erect the menorah. Judge Feinberg responded for the court: "If this were so, however, the public forum doctrine would swallow up the Establishment Clause." Id. at 1029. I agree with this analysis.
 
 
 139
 I also believe that the court in Smith v. County of Albemarle, Virginia, 895 F.2d 953 (4th Cir.1990), decided the issue correctly. In Smith, the court found that a nativity scene erected on the front lawn of the County Office Building by a private group violated the Establishment Clause. The lawn was a least a "designated public forum," which required that there be a compelling state interest in order to permit content-based regulation of speech there. The court found that a small disclaimer sign did not serve to render the display permissible. In rejecting Smith 's application to this case the majority opinion states that the lawn was "rarely used for such events," making the "county's citizens more likely to draw a connection" between the government and the speakers. Does the majority opinion mean that the result turns on how often the public forum is used as well as by the degree of familiarity the "reasonable observer" has with past uses?
 
 IV.
 A.
 
 140
 Several times since the Supreme Court decided Lynch and Allegheny County this court has dealt with the Establishment Clause issue raised by religious symbols being placed on public property, either by governmental units or private parties.
 
 
 141
 In ACLU v. City of Birmingham, 791 F.2d 1561 (6th Cir.), cert. denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), a divided panel held that a city violated the Establishment Clause by displaying a city-owned creche on the lawn of City Hall during the Christmas season. The nativity scene included the traditional figures used to depict the Biblical story of the birth of Jesus. "Absolutely nothing else [was] included in the display." Id. at 1562. Applying the three-pronged Lemon test and Justice O'Connor's endorsement standard in Lynch, the majority of the panel concluded that the display in a prominent position on the lawn of the official headquarters building of the municipality, without any offsetting secular symbols of the season, had the effect of endorsing Christianity.
 
 
 142
 The creche called attention to a single aspect of the Christmas season--its religious origin. Thus, standing alone without any nonreligious symbols, it "sen[t] a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Id. at 1566 (quoting Lynch, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring)).
 
 
 143
 ACLU v. Wilkinson, 895 F.2d 1098 (6th Cir.1990), arose when the Commonwealth of Kentucky erected a 15-foot high stable, containing approximately 20 by 30 feet of floor space on the State Capitol grounds during the 1988 Christmas holiday season. The stable had a manger and some straw inside, but it contained no statues or figurines traditionally used to depict the birth of Jesus and events that followed. The ACLU sought an injunction to require the State to remove the stable. Three times prior to the district court hearing, church groups were permitted to conduct pageants in and around the stable with live persons and animals representing figures in the Biblical story. Id. at 1100-01.
 
 
 144
 The district judge held a hearing and viewed the site. He denied the request for an injunction, provided that the State prominently display a sign advising the public that the area around the stable was a public forum available to responsible civic and religious groups "for holiday ceremonies, pageants or displays;" the State adopt a formal written policy consistent with this notice; private funds defray all expenses in connection with the stable; and the State post a disclaimer in front of the stable "in letters big enough to be read from an automobile passing on the street before it." Id. at 1099-1100.
 
 
 145
 A divided panel of this court affirmed the judgment denying an injunction. The majority opinion distinguished City of Birmingham and Allegheny County as follows:
 
 
 146
 The present case differs from both City of Birmingham and Allegheny County in that here we have a structure capable of use for non-religious purposes, and the structure is unaccompanied by any display of religious figurines or statues. The nativity scene in City of Birmingham was comprised solely of "figurines depicting the Christ Child, the Mother Mary, Joseph, three costumed shepherds, and several lambs," 791 F.2d at 1562, while the Allegheny County creche included "figures of the infant Jesus, Mary, Joseph, farm animal, shepherds, and wise men, all placed in or before a wooden representation of a manger...." 492 U.S. at 580, 109 S.Ct. at 3094, 106 L.Ed.2d at 486. (emphasis in original).
 
 
 147
 Id. at 1103. Nevertheless, because there were no secular symbols associated with the season in the immediate area of the stable, the majority concluded that, in the absence of a disclaimer, the unadorned stable might lead a "reasonable observer" to find some religious significance in the display. Id. at 1103. The combination of notice that the area was a public forum and the unequivocal disclaimer were found sufficient to dispel any message of endorsement.
 
 
 148
 Doe v. City of Clawson, 915 F.2d 244 (6th Cir.1990), involved a citizen's challenge to the display of a creche containing all the traditional figures on the front lawn of the City Hall. Many secular figures and symbols were included in the overall display. Judge Milburn, writing for a unanimous panel, found that the display fell somewhere between the creche and menorah displays considered by the Supreme Court in Allegheny County. This court found that the City of Clawson creche, as displayed, did not violate the Establishment Clause. The court reached this conclusion after identifying three factors considered by the Allegheny County Court in making its "endorsement" determination: context, composition, and location. Id. at 247. Analyzing these factors the court found that the creche was displayed in the context of celebration of Christmas as a national holiday; the composition of the display included secular symbols of the season that had separate "focal points" with different visual stories to tell, that detracted from the creche's religious message; and although the location of the display on city hall lawn was troublesome, the "combined display" ... "conveys a message of pluralism" rather than one of endorsement. Id. at 248-49.
 
 
 149
 We also have published opinions in connection with stay orders in this case, Grand Rapids I, 922 F.2d 303 (6th Cir.1990), and in Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458 (6th Cir.1991). In Grand Rapids I the panel concluded that the Chabad House had demonstrated a sufficient likelihood of success on the merits to warrant this court's staying the district court injunction. That was the only issue before the court, and it prefaced its discussion of the merits by stating: "We strongly emphasize that we are not now deciding the appeal. That must wait until full briefing and the opportunity for oral argument." 922 F.2d at 306.
 
 
 150
 A divided panel denied a stay of the district court's refusal to enter an injunction in Congregation Lubavitch v. Cincinnati upon finding that while Fountain Square is a public forum in Cincinnati, it "does not carry the same suggestion of imprimatur as a location near City Hall." 923 F.2d at 462. Judge Guy dissented and would have granted a stay until the case could be decided on the merits. He expressed the view that the public forum doctrine "does not give members of the public an unfettered right to place tangible objects in a public square and leave them there unattended...." 923 F.2d at 463.
 
 B.
 
 151
 Of course, none of these decisions, and least of all, those that decided preliminary injunction questions without reaching the merits, is binding on this en banc court. The only one of these cases with facts even remotely analogous to those in the present case is Wilkinson. The Wilkinson court found the disclaimer sign dispositive in view of its determination that without a disclaimer, the stable, in its setting, would convey a message of endorsement of Christianity. 895 F.2d at 1103. But all disclaimer signs are not equal.
 
 
 152
 There was no ambiguity about the disclaimer sign in Wilkinson. It made two statements: (1) that the display was not constructed with public funds and did not constitute the Commonwealth's endorsement of any religion or religious doctrine; and (2) that the immediate area of the stable structure was a public forum, available to all responsible citizens and groups, civic and religious, for holiday displays. 895 F.2d at 1101-02 n. 2. By contrast, the "disclaimer" in the present case contained at the sign's very top a religious greeting, in large letters, followed by an identification of Chabad House and a statement that its presence did not constitute an endorsement by the City, all in smaller letters.
 
 
 153
 The stable in Wilkinson was just an ordinary small farm building, "capable of use for non-religious purposes." 895 F.2d at 1103. There were no statues or figurines depicting the characters in the New Testament accounts of the birth of Jesus. When the church groups were acting out that story, "observers" would presumably draw near enough to see and hear the performance. From such location, the disclaimer sign would be clearly legible and its language would effectively negate what could otherwise easily be construed as endorsement of the religious message that clearly was being sent. By contrast, the very size and placement of the menorah, as shown by the photographs, sent its religious message far beyond those locations from which the disclaimer language could be read. From a distance, only the menorah itself and the religious message "HAPPY CHANUKAH TO ALL" could be read. Further, one who observed the stable in Wilkinson from afar saw nothing but an unremarkable building with no religious trappings; the Calder Plaza menorah, from a similar distance, sent only a religious message.
 
 
 154
 I do not believe a city or other governmental unit should be permitted to escape responsibility for permitting the erection and unattended presence of religious symbols on public land intimately associated with government by merely erecting a sign that says "what you see is not what you think you see." If the natural effect of such a display in a particular location is to create an inference of endorsement or support, no words should be found sufficient to counter that impression. If the court concludes that Wilkinson correctly held that a simple disclaimer is sufficient to satisfy the absolute prohibition of the Establishment Clause, however, I believe the disclaimer should at least be as unambiguous and clear as the one approved in Wilkinson. The sign erected by Chabad House in the present case (and all such cases must be decided on their own facts) does not satisfy that requirement.
 
 CONCLUSION
 
 155
 The fact that religious expression takes place in a public forum does not in any way lessen the force of the Establishment Clause; that fact does, however, require a stringent examination to determine whether the government's effort to limit speech in a particular setting serves a compelling government interest. Every unit of government in the United States, including the City of Grand Rapids, has a compelling interest in observing the Establishment Clause and preserving the values that Clause guarantees. To accept the majority's construction of the interplay between Establishment Clause principles and the public forum doctrine would turn the Establishment Clause into a paper screen rather than the bulwark of separation between church and state it was intended to be.
 
 
 156
 Justice Stevens's statement in Allegheny County provides the proper approach to cases of this kind:
 
 
 157
 In my opinion the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property. There is always a risk that such symbols will offend nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful. Some devout Christians believe that the creche should be placed only in reverential settings, such as a church or perhaps a private home; they do not countenance its use as an aid to commercialization of Christ's birthday. In this very suit, members of the Jewish faith firmly opposed the use to which the menorah was put by the particular sect that sponsored the display at Pittsburgh's City-County Building. Even though "[p]assersby who disagree with the message conveyed by these displays are free to ignore them, or even to turn their backs," displays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt differences among individuals than to achieve an ecumenical goal. The Establishment Clause does not allow public bodies to foment such disagreement.
 
 
 158
 492 U.S. 573, 650-51, 109 S.Ct. 3086, 3131-32, 106 L.Ed.2d 472 (Stevens, J., concurring in part and dissenting in part) (citations and footnotes omitted).
 
 
 159
 I would affirm the judgment of the district court.APPENDIX
 
 
 160
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLENOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLENOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 The complaint originally sought to prevent the placement of the menorah on any public property. At oral argument, plaintiffs conceded that placement in a park away from government buildings would be constitutional
 
 
 [2]
 In Widmar, Justice White argued that religious worship is not protected by the free speech guarantee of the first amendment, but is protected instead only by the religion clauses. Widmar v. Vincent, 454 U.S. 263, 284, 102 S.Ct. 269, 281-82, 70 L.Ed.2d 440 (1981) (White, J., dissenting). The Court, however, specifically rejected this argument. 454 U.S. at 269 n. 6, 102 S.Ct. at 274 n. 6
 
 
 [3]
 "The courts have gone to unusual pains to emphasize the abstract and hypothetical character of this mythical person. He is not to be identified with any ordinary individual, who might occasionally do unreasonable things; he is a prudent and careful man, who is always up to standard. Nor is it proper to identify him even with any member of the very jury who are to apply the standard; he is rather a personification of a community ideal of reasonable behavior, determined by the jury's social judgment." William L. Prosser, The Law of Torts 154 (3d ed. 1964)
 
 
 [4]
 Justice O'Connor's plurality opinion was joined by Chief Justice Rehnquist, Justice White, and Justice Blackmun. Justice Kennedy, who wrote a concurring opinion in Mergens joined by Justice Scalia, would not even have used the endorsement test. Instead, he upheld the Equal Access Act because it neither gave direct benefits to religion in such a manner that it tended to establish a state religion, nor coerced any student to participate in a religious activity. Mergens, 496 U.S. at 260, 110 S.Ct. at 2377 (Kennedy, J.) (concurring in part and concurring in the judgment)
 
 
 [5]
 Opponents of any display could easily make the contrary argument when necessary. For example, the former mayor of Beverly Hills, opposing "the ceremonial lighting of a 27-foot menorah ... at a city park," objected mightily because "the event was distinctly religious." He described it as "something like a Jewish revival meeting.... It makes it appear that the city was taking part in the religious ceremony...." L.A. Times, Jan. 11, 1987, part 9, at 1
 
 
 [6]
 There is a slight conflict between the dissent and the plaintiffs in that the plaintiffs concede that a reasonable observer who reads the signs could not believe there is an endorsement, while the dissent states that if the natural effect of the menorah in the plaza "creates an inference of endorsement or support, no words should be found sufficient to counter that impression." (At 1564)
 
 
 [7]
 The selectivity of the knowledge of the plaintiffs' reasonable observer is further emphasized by the treatment of the significance accorded to the respective structures of the menorah and the Calder stabile. It is considered significant that the stable is a symbol of Grand Rapids, a fact that is surely not known to everyone, while it is assumed that the significance of the menorah is known to everyone, which is surely not the case. Thus, some untutored passersby might think that the stabile was the object with religious significance and not the menorah. And what if a group arose that worshiped Calder and his works? Would that require the removal of the stabile? These thoughts simply emphasize the necessity of adhering to the standard discussed above (At 1543-44), that the reasonable observer used in the resolution of these cases must be an observer in possession of all of the relevant facts. Once it is admitted that the observer is ignorant in some areas, there is no objective means of deciding who gets to make up the components of the observer's knowledge
 
 
 [8]
 For an excellent discussion of this concept, see Harry Kalven, Jr., The Negro and the First Amendment 140-60 (1965)
 
 
 [1]
 The individual plaintiffs, whom the district judge saw and heard, were concerned residents of Grand Rapids. The district court's conclusions rest in part upon an implicit finding that these parties were representative "reasonable observers."